IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NOKIA TECHNOLOGIES OY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 25-1054-GBW |
| | ) | |
| PARAMOUNT SKYDANCE CORPORATION, | ) | **JURY TRIAL DEMANDED** |
| PARAMOUNT GLOBAL, and PARAMOUNT | ) | |
| STREAMING        SERVICES,        INC., | ) | |
| | ) | |
| Defendants. | ) | |

**OPENING BRIEF IN SUPPORT OF DEFENDANTS PARAMOUNT
SKYDANCE CORPORATION, PARAMOUNT GLOBAL, AND PARAMOUNT
STREAMING SERVICES, INC.'S PARTIAL MOTION TO DISMISS PURSUANT TO
<u>FED. R. CIV. P. 12 (b)(6) AND 35 U.S.C. § 101</u>**

*Of Counsel:*

Sharon L. Davis
Jennifer Maisel
Kristen Logan
Bryan Thompson
ROTHWELL, FIGG, ERNST & MANBECK,
P.C.
901 New York Ave., N.W., Suite 900 East
Washington, DC 20001
(202) 783-6040

Dated: October 16, 2025

John G. Day (#2403)
Brian A. Biggs (#5591)
ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
jday@ashbygeddes.com
bbiggs@ashbygeddes.com

*Attorneys for Defendants*

{02174123;v1 }

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

I.     NATURE AND STAGE OF THE CASE..................................................................1

II.    INTRODUCTION AND SUMMARY OF ARGUMENT ..........................................1

III.   FACTUAL BACKGROUND.....................................................................................2

    A.     The '204 Patent ...........................................................................................2

    B.     The '321 Patent and the '005 Patent – the "Numbering Patents"............................5

        1.     The '321 Patent ................................................................. 5

        2.     The '005 Patent ................................................................. 7

    C.     The '450 Patent ...........................................................................................8

IV.    APPLICABLE LEGAL STANDARDS .....................................................................9

    A.     Motion to Dismiss for Failure to State a Claim ...............................................9

    B.     Patent Eligible Subject Matter Under 35 U.S.C. § 101 .......................................10

V.     ARGUMENT............................................................................................................10

    A.     The '204 Patent Is Invalid under 35 U.S.C. § 101..............................................10

        1.     *Alice* Step One: Representative Claim 1 is Directed to the Abstract Idea of Delegating Authority in Accessing Resources ............................. 10

        2.     *Alice* Step Two: Representative Claim 1 Does Not Contain an Inventive Step ..................................................................... 12

    B.     The Numbering Patents Are Invalid under 35 U.S.C. § 101 ................................14

        1.     *Alice* Step One: the Numbering Patents Are Directed to the Abstract Idea of a Numbering Scheme for Organizing Data (Image Frames)........ 14

        2.     *Alice* Step Two: the Representative Claims of the Numbering Patents Do Not Contain an Inventive Step ............................... 15

    C.     The '450 Patent Is Invalid under 35 U.S.C. § 101 ...............................................18

        1.     *Alice* Step One: Claim 31 is Directed to the Abstract Ideas of Using Mathematical Concepts in Video Compression........................................ 18

        2.     *Alice* Step Two: Claim 31 Does Not Contain an Inventive Step ............. 19

VI.    CONCLUSION................................................................................................................20

## TABLE OF AUTHORITIES

**Cases**

*Adaptive Streaming Inc. v. Netflix, Inc.*,
   836 F. App'x 900 (Fed. Cir. 2020) ........................................................................ 18

*Alice Corp. Pty. v. CLS Bank Int'l*,
   573 U.S. 208 (2014) ............................................................................................... 10

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................................. 9

*Broadband iTV, Inc. v. Amazon.com, Inc.*,
   113 F.4th 1359 (Fed. Cir. 2024) ........................................................................... 10

*BSG Tech LLC v. Buyseasons, Inc.*,
   899 F.3d 1281 (Fed. Cir. 2018) ...................................................................... 13, 17

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
   859 F.3d 1352 (Fed. Cir. 2017) ........................................................................... 10

*Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*,
   955 F.3d 1317 (Fed. Cir. 2020) ....................................................................... 2, 11

*In re Bd. of Trs. of Leland Stanford Junior Univ.*,
   991 F.3d 1245 (Fed. Cir. 2021) ........................................................................... 20

*In re Gitlin*,
   775 F. App'x 689 (Fed. Cir. 2019) ...................................................................... 20

*In re TLI Commc'ns LLC Pat. Litig.*,
   823 F.3d 607 (Fed. Cir. 2016) ......................................................................... 2, 15

*Intell. Ventures I LLC v. Erie Indem. Co.*,
   850 F.3d 1315 (Fed. Cir. 2017) ........................................................................... 16

*Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*,
   566 U.S. 66 (2012) ................................................................................................ 10

*Optis Cellular Tech., LLC v. Apple Inc.*,
   139 F.4th 1363 (Fed. Cir. 2025) ............................................................................ 2

*Prism Techs. LLC v. T-Mobile USA, Inc.*,
   696 F. App'x 1014 (Fed. Cir. 2017) ............................................................... 10, 12

*RecogniCorp, LLC v. Nintendo Co.*,
   855 F.3d 1322 (Fed. Cir. 2017) ...................................................................... 18, 20

*SAP Am., Inc. v. InvestPic, LLC*,
   898 F.3d 1161 (Fed. Cir. 2018) ...................................................................... 10, 18

*Secured Mail Sols. LLC v. Universal Wilde, Inc.*,
   873 F.3d 905 (Fed. Cir. 2017) ............................................................................... 9

*Smart Sys. Innovations, LLC v. Chicago Transit Auth.*,
  873 F.3d 1364 (Fed. Cir. 2017) ........................................................................ 10

*Universal Secure Registry LLC v. Apple Inc.*,
  10 F.4th 1342 (Fed. Cir. 2021) ................................................................... 10, 11

*Weisner v. Google LLC*,
  51 F.4th 1073 (Fed. Cir. 2022) ........................................................................ 10

**Statutes**

35 U.S.C. § 101 ........................................................................................... passim

**Rules**

Fed. R. Civ. P. 12(b)(6) .................................................................................... 1

Defendants, Paramount Skydance Corporation, Paramount Global, and Paramount Streaming Services, Inc. (collectively, "Paramount"), respectfully submit this Opening Brief in Support of their Motion to Dismiss Plaintiff Nokia Technologies Oy's ("Nokia") Complaint.

## I.    NATURE AND STAGE OF THE CASE

On August 21, 2025, Nokia filed its Complaint asserting that Paramount infringes thirteen patents.  Paramount moves to dismiss counts IV, VI, VII, and XIII pursuant to Fed. R. Civ. P. 12(b)(6) based on the unpatentability of U.S. Patent Nos. 8,776,204 (the "'204 Patent"); 8,050,321 (the "'321 Patent"); 6,968,005 (the "'005 Patent"); and 7,082,450 (the "'450 Patent") (collectively, the "Challenged Patents") under 35 U.S.C. § 101.

## II.    INTRODUCTION AND SUMMARY OF ARGUMENT

Nokia alleges that Paramount's video streaming services, including Paramount+, infringe thirteen patents, twelve related to video encoding and one related to authentication.  Nokia's infringement claims primarily rely on a well-established video streaming standard known as the AVC or H.264 standard.  The AVC standard was developed by an international standard setting process and has been used by Paramount and other streaming companies for many years.  Indeed, nine asserted patents have expired, and another will expire in December 2025.  Despite relying on the AVC standard as a basis for its infringement claims, Nokia asks this Court to enter a declaratory judgment that the asserted video encoding patents are <u>not</u> subject to Nokia's commitment to license any patents that are essential to the AVC standard on reasonable, non-discriminatory terms ("RAND").  D.I. 1, ¶¶ 272-79.  Nokia's case against Paramount exemplifies the longstanding concern that patent owners will demand high, non-RAND royalty rates after techniques allegedly covered by their patents have been included in widely adopted international standards.

The four Challenged Patents are directed to abstract ideas that are unpatentable under Section 101: (1) controlling access to resources (the '204 Patent); (2) numbering items in a set of

data (specifically, video frames) (the '321 and '005 Patents); and (3) using mathematical concepts (*i.e.*, simplification and approximation) in video encoding (the '450 Patent). Using authentication to control access to resources is an abstract idea. *See Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1327 (Fed. Cir. 2020) (Federal Circuit has "repeatedly found the concept of controlling access to resources via software to be an abstract idea"). Organizing data, such as by labeling or numbering items in a group, is an abstract idea. *See In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016) ("classifying an image and storing the image based on its classification" is abstract). And merely applying mathematical formulas or algorithms to data is an abstract idea. *See Optis Cellular Tech., LLC v. Apple Inc.,* 139 F.4th 1363, 1380 (Fed. Cir. 2025) (collecting cases holding that claims focused on mathematical equations are directed to abstract ideas). Because, as explained below, the representative claims of the Challenged Patents are directed to these unpatentable abstract ideas, they fail the first step of the *Alice* test.

At *Alice* step two, the claim language and specifications demonstrate that these claims lack an inventive step because they implement abstract ideas using conventional, generic technology in customary ways. Because "[t]he abstract idea itself cannot supply the inventive concept, no matter how groundbreaking the advance," the Challenged Patents fail the second step as well. *Optis,* 139 F.4th at 1380 (internal quotations omitted). And none of Nokia's alleged advantages transform the claims because they arise from implementing the abstract ideas themselves. Accordingly, as explained in detail herein, the Counts IV, VI, VII, and XIII of the Complaint should be dismissed.

## III.    FACTUAL BACKGROUND

### A.    The '204 Patent

The '204 Patent claims methods for delegating authority to enable applications to access resources in communication networks. *See* D.I. 1-13, '204 Patent at 1:6-11. It describes that "'authority delegation' generally refers to one party, who has access to some item, giving

permission to another party to access the item." *Id*. at 4:13-15. "Three types of actors" participate in authority delegation: (1) a "resource owner 102" (*e.g.*, an "online movie service provider"); (2) a "resource requestor 104" (*e.g.*, "Bob," a "subscriber of an online movie service"); and (3) a "resource residence 106" (*e.g.*, the location where movies are stored). *Id*. at 4:55-5:11. "To gain access to certain protected resources in the resource residence 106 [*i.e.*, the movie], the resource requestor 104 [*i.e.*, Bob] needs to obtain directly from the resource owner 102 [*i.e.* the online movie service provider] an authorization token." *Id*. at 5:12-15.

Nokia charts claim 1 of the '204 Patent in its Complaint. Claim 1 states:

[1.0] A method, comprising:

[1.1] in a communication network wherein a first computing device represents a resource owner and a second computing device represents a resource requestor, the resource owner detecting an occurrence of an event, wherein the event occurrence represents a request to access one or more resources of the resource owner stored in a resource residence; and

[1.2] the resource owner sending an authorization token to the resource requestor in response to the event occurrence, the authorization token serving as a proof of authorization delegated by the resource owner to be presented by the resource requestor to the resource residence so as to permit the resource requestor to access the one or more requested resources stored in the resource residence;

[1.3] wherein the authorization token comprises a verifiable structure comprising:

one or more fields, the one or more fields comprising at least one of: a method to be used by the resource residence for authenticating the resource requestor; and a strength of the method to be used by the resource residence for authenticating the resource requestor; and

a signature computed over the one or more fields, the signature being computed utilizing a private key of the resource owner.

D.I. 1-13, '204 Patent at 9:44-10:3.

The claimed method involves two steps: [1.1] a resource owner detecting a request to access one or more resources stored in a resource residence, and [1.2] providing an authorization token to the resource requestor to access resources. The remaining elements [1.3] recite generic components of an authorization token, comprising a "field" and a "signature computed over the

[field]." The specification describes using conventional computer technology to implement the claimed invention. *See, e.g.,* D.I. 1-13, '204 Patent at 1:50-56 ("communication networks" include World Wide Web), 8:65-9:1 ("computing devices" are "programmed computers operating under control of computer program code"). It also describes that "the technique used for authenticating the requestor can comprise any conventional authentication technique," *id.* at 5:57-59, and that the authorization token "is composed of a list of fields . . . and the issuer's signature 202 computed over the fields using a signature algorithm 210 specified (e.g., RSA-SHA1 and HMAC-SHA256) based on the issuer's private key or a shared secret." *Id.* at 7:51-56. The '204 Patent does not purport to invent, nor do the claims require, any novel "field" or "signature" algorithm. *See, e.g., id.* at 7:51-56 (identifying conventional signature algorithms).

Claim 1 is representative of claims 1-31 for purposes of the patent-eligibility analysis. Claims 16 and 26 are article of manufacture and apparatus claims, respectively, nearly identical in scope to claim 1. Claims 17, 25, and 27 replace step [1.2] with a limitation of the resource requestor receiving a token sent by the resource owner. Claims 24, 25, and 28 replace step [1.2] with limitations that the resource requestor received a token sent by the resource owner and the resource residence receiving the token. The dependent claims are all directed to the same abstract idea as claim 1, adding merely conventional implementation details. Claims 2 and 3 specify that the event occurrence results in either a "pull" or "push" communication method; claim 4 specifies a resource residence in a third computing device; claim 5 specifies that obtaining and presenting the token is bound to an existing application protocol; claims 6-8 and 29-30 specify aspects or contents of the token; claim 9 specifies that the resource requestor obtains the token in one round trip; claims 10-14 and 21-22 specify that the token is transferable; claims 15 and 18 specify that the resource owner authenticates the resource requestor before sending the token; and claims 18-

20 recite authenticating the resource requestor or verifying the token.

**B.      The '321 Patent and the '005 Patent – the "Numbering Patents"**

**1.      The '321 Patent**

The '321 Patent is directed to assigning identifier values (such as numbers) to the image frames in a sequence of video frames to indicate an encoding order.  The background describes that "video files in multimedia files comprise a great number of still image frames, which are displayed rapidly in succession . . .  to create an impression of a moving image."  D.I. 1-4, '321 Patent at 1:55-62.  "To reduce the amount of data in video files, the image data can be compressed into a smaller form by reducing the amount of redundant information in the image frames."  *Id*. at 2:5-7.  One known data-reduction technique is called "motion-compensated temporal prediction," where "the contents of some (typically most) of the image frames in a video sequence are predicted from other frames in the sequence."  *Id*. at 2:17-26.  A video sequence therefore includes "INTRA-frames, or I-frames," which contains compressed image data but are not predicted from any other frame, and "INTER-frames, or P-frames (Predicted)," which are determined using one I-frame and possibly one or more previously coded P-frames.  *Id*. at 2:25-33.  The '321 Patent admits that "frames are typically numbered according to an arithmetical series."  *Id*. at 3:19-20.

In view of these known techniques, the '321 Patent claims encoding an indication of an I-frame as a "first picture," of a group of interrelated frames, and encoding identifier values for each additional P-frame in the group according to a numbering scheme.  *See id*. at 4:16-46.  For example, as illustrated in FIG. 2, the first I-frame 200 of a group of pictures (*e.g.*, a "sub-sequence") is numbered as I.0.0—the first and second zeroes identifying the sub-sequence and image number within the sub-sequence respectively.  *See id*. FIG. 3a, 12:22-26.  The three P frames that follow are assigned image numbers 1, 2 and 3.  *See id*. at 12:26-31.  The second I-frame in FIG. 3a [308] is the first image in the next sub-sequence and is thus numbered as I.1.0.  *See id.* at

12:31-34. Thus, the claimed invention is implementing a specific numbering scheme for certain data elements (the image frames in a sequence) in the context of a conventional encoding process.

Nokia charts claim 1 of the '321 Patent in its Complaint. Claim 1 states.

[1.0] A method for encoding a video sequence comprising an independent sequence of image frames, wherein all motion-compensated temporal prediction references of the independent sequence refer only to image frames within said independent sequence, the method comprising:

[1.1] encoding into the video sequence an indication of at least one image frame, which is the first image frame, in decoding order, of the independent sequence;

[1.2] encoding identifier values for the image frames according to a numbering scheme; and

[1.3] resetting the identifier value for the indicated first image frame of the independent sequence.

D.I. 1-4, '321 Patent at 22:58-23:2.

Claim 1 recites a method for "encoding a video sequence comprising an independent sequence of image frames." Step [1.1] includes encoding an indication of the first image frame of the sequence (*e.g.*, assigning the first I-frame image number 0), step [1.2] includes encoding identifier values for the image frames according to a numbering scheme (*e.g.*, assigning the next frame number as 1), and step [1.3] includes resetting the identifier value for the indicated first image frame of the independent sequence (restarting the numbering for each new sequence).

Claim 1 is representative of claims 1-11 for purposes of the patent-eligibility analysis. Claims 4 and 7 are directed to a "video encoder" and a "computer program product" containing the same limitations as claim 1. *Id.* at 23:9, 23:33. Dependent claims 2 and 5 specify that the indication is encoded "as a separate flag included in the header of a slice," and dependent claims 3 and 6 specify that the identifier value for the independent sequence is encoded into the video sequence. *Id.* at 23:4-8, 23:27-33. Claims 8-11 are directed to the same abstract idea and using the same techniques described in claims 1-7 from the decoding perspective. *Id.* at 23:49-24:53.

2.      **The '005 Patent**

Like the '321 Patent, the '005 Patent is directed to assigning numbers to particular frames in the video sequence. The '005 Patent similarly describes the conventional use of I-frames (which do not use temporal redundancy reduction) and P-frames (which are predicted from a picture occurring before the current picture. *See* D.I. 1-6, '005 Patent at 1:30-40. The '005 Patent describes an encoding scheme where "each reference picture (e.g., I-frames and P-frames) is associated with a sequence number," and preferably "the indicator is incremented each time a reference picture is encoded" (*e.g.*, by one each time a reference picture is encoded). *Id.* at 4:2-19. By including the indicator—*i.e.*, the incremental numbers assigned to each reference picture— "a decoder is capable of determining whether a reference picture has been lost and to take appropriate action, if available." *Id.* at 4:23-35.

Nokia charts claim 1 of the '005 Patent in its Complaint. Claim 1 states:

[1.0.] A method of encoding a video signal representing a sequence of pictures to form an encoded video signal comprising temporally independent INTRA pictures and temporally predicted pictures, wherein the INTRA pictures and at least some of the temporally predicted pictures are used to form reference pictures for the temporal prediction of other pictures in the video sequence, comprising

[1.1] indicating an encoding order of those pictures used to form reference pictures in the encoded video signal with a sequence indicator having an independent numbering scheme, such that consecutive pictures used to form reference pictures in encoding order are assigned sequence indicator values that differ with respect to each other by a predetermined amount independent of the number of non-reference pictures encoded between successive reference pictures.

D.I. 1-6, '005 Patent at 15:2-17.

Claim 1 includes one step: [1.1] indicating an encoding order of those pictures used to form reference pictures in the encoded video signal with a sequence indicator having an "independent numbering scheme." That numbering scheme assigns a sequence indicator value (*e.g.*, 1, 2, and so forth) that differs by a predetermined amount independent of the number of non-

reference pictures encoded between successive reference pictures. The remaining claim elements recited in [1.0] describe use of conventional I-frames and P-frames.

Paramount submits that claim 1 is representative of claims (1-4, 7-8, 10-15, 21-27, 37-39, and 40-44). Claims 7, 10, and 37 are directed to a video encoder, a portable radio communications device, and an encoded video signal that have substantially the same limitations as claim 1. Dependent claims 2, 8, 15, and 38 specify that the sequence indicator values differ by a predetermined amount of one; claims 3, 4, 13, 22, 23, 26, 39, 40, and 43 specify where the sequence indicator is included (*e.g.*, in a picture header, the Supplemental Enhancement Information of the well-known H.263 video encoding standard, a picture segment header, or a macroblock header); claims 11, 12, 24, 25, 41, and 42 specify that the sequence indicator is associated with a whole picture or part of a picture, respectively; and claims 14, 21, 27, and 44 specify that the video signal is scalably encoded and sequence indicators are associated with layers of the scalably encoded video signal.

### C.    The '450 Patent

The '450 Patent is directed to "processing of digital data," and more specifically "to a method for implementing an approximation of a discrete cosine transform (DCT) and a quantization" for compressing digital data. D.I. 1-7, '450 Patent at 1:6-11. The background concedes that it "is known from the state of the art to use a sequence of DCT and quantization for compressing digital data." *Id*. at 1:22-25; *see also id*. at 3:27-30 ("the DCT . . . has been widely used…"). The specification further identifies numerous known solutions for reducing the number of operations for DCT in video coding. *See id*. at 3:34-5:7.

Nokia charts claim 31 of the '450 Patent in its Complaint. Claim 31 states:

[31.0] A method of encoding digital data, the method comprising:

[31.1] transforming said digital data by applying a simplified transform matrix to said digital data, the simplified transform matrix being obtained by simplifying a predetermined transform matrix to require less operations when applied to digital data, and in which simplified transform matrix elements constituting irrational numbers are approximated by rational numbers; and

[31.2] quantizing said transformed digital data by performing an extended quantization operation, the extended quantization operation being obtained from a predetermined quantization operation by including operations removed by simplifying the predetermined transform matrix, said extended quantization operation being adjusted to compensate for said approximation of elements of said simplified transform matrix.

D.I. 1-7, '450 Patent at 22:17-34.

Claim 31, the only asserted claim for this patent, is directed to implementing the mathematical process of: [31.1] transforming digital data by applying a simplified transform matrix with approximation of irrational numbers, which by its nature would require fewer operations, and [31.2] quantizing the transformed digital data by performing an extended quantization operation. The claim does not require any specific hardware, software, or computer technology. Rather, claim 31 is directed purely to using a particular math formula, in the context of the known, conventional encoding process.

## IV.    APPLICABLE LEGAL STANDARDS

### A.    Motion to Dismiss for Failure to State a Claim

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). While all well-pleaded factual allegations are accepted as true, "a court need not accept as true allegations that contradict matters properly subject to judicial notice or by exhibit, such as the claims and the patent specification." *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 913 (Fed. Cir. 2017) (internal quotations omitted). Patent eligibility "may be, and frequently has been, resolved on a Rule 12(b)(6) or (c) motion." *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018); s*ee also Cleveland Clinic*

*Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017).

### B. Patent Eligible Subject Matter Under 35 U.S.C. § 101

To determine patent eligibility, the Supreme Court established the *Alice* test – a two-step framework in which a court determines: (1) if the claim is "directed to one of those patent-ineligible concepts"; and if so, (2) whether the elements of the claim, considered "both individually and 'as an ordered combination' … 'transform the nature of the claim' into a patent-eligible application." *Alice Corp. Pty. v. CLS Bank Int'l,* 573 U.S. 208, 217 (2014) (quoting *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 78-79 (2012)). The Supreme Court describes the second step as a search for an "inventive concept," which is an element or combination of elements that is sufficient to ensure the patent in practice amounts to significantly more than a patent upon the ineligible concept itself. *Id.* at 217-18 (citations omitted). "When the patent's specification 'describes the components and features listed in the claims generically,' it 'support[s] the conclusion that these components and features are conventional.'" *Broadband iTV, Inc. v. Amazon.com, Inc*., 113 F.4th 1359, 1370 (Fed. Cir. 2024) (quoting *Weisner v. Google LLC*, 51 F.4th 1073, 1083–84 (Fed. Cir. 2022)).

## V.    ARGUMENT

### A.    The '204 Patent Is Invalid under 35 U.S.C. § 101

#### 1.    *Alice* Step One: Representative Claim 1 is Directed to the Abstract Idea of Controlling Access to Resources

Few issues are more settled in the law applying Section 101 than that authenticating users to allow access to resources is an abstract idea. *See, e.g., Universal Secure Registry LLC v. Apple Inc.*, 10 F.4th 1342, 1352 (Fed. Cir. 2021); *Prism Techs. LLC v. T-Mobile USA, Inc.*, 696 F. App'x 1014, 1017 (Fed. Cir. 2017); *Smart Sys. Innovations, LLC v. Chicago Transit Auth.*, 873 F.3d 1364, 1371 (Fed. Cir. 2017). The Federal Circuit has repeatedly held that claims directed to controlling

"access to resources" are unpatentable as they are "exactly the sort of process that can be performed in the human mind, or by a human using a pen and paper." *Ericsson Inc.*, 955 F.3d at 1327 (internal quotations omitted).  In finding an authentication process abstract in *Ericsson*, the Federal Circuit compared the claims to libraries that loan out materials to people who have membership cards and office buildings that restrict floor access to employees based on key fobs.  *See id.*

The reasoning of *Ericcson* applies equally to claim 1 because it is directed to a standard authentication process where access is provided by an entity that owns the resource but stores it at a different location.  The specification describes controlling access to "resources" (*e.g.*, movies) wherein the "resource owner" (*e.g.*, an online movie service provider) gives a "resource requestor" (*e.g.*, Bob, a subscriber) a token to prove to the place where the resources are stored ("resource residence") that he has authorization to access those resources. D.I. 1-13, '204 Patent at 4:55-5:15. The requestor sends an alert to the owner, who then provides the requestor with an authorization token that can be used at the residence to gain access to the intended data.  To use the Federal Circuit's examples, imagine a library card issued by a city library system that is presented at different branches to gain access to the books residing at that branch.  Or a key fob received from the main office that allows an employee access to a remote location.  Claim 1 is directed to nothing more than implementing such an access system on a generic "computer network."

Using allegedly novel approaches to achieve benefits such as protecting user identity of privacy does not change the result.  In *Universal Secure Registry LLC*, 10 F.4th at 1348-49, the Federal Circuit addressed the patent eligibility of a process for authenticating users that allowed a person to be "authenticated without necessitating the provision of any personal information" by using a "time-varying multicharacter code." (internal quotations omitted).  Like the '204 Patent, the patent-at issue involved multiple entities and sending the user's authentication to the entity

with the secure resource without revealing information to that entity.  The Federal Circuit held that claim to be directed to the abstract idea of verifying a user's identity prior to enabling a transaction. *See id*. at 1352.  Likewise, claim 1 is directed to the abstract idea of controlling access to resources, and therefore fails at *Alice* step one.

       2.    ***Alice* Step Two: Representative Claim 1 Does Not Contain an Inventive Step**

Claim 1 does not recite any inventive step to save it from abstraction.  The specification itself demonstrates that the technology used to send and receive requests and resources is entirely conventional.  As FIG. 8 shows, the method is implemented using three generic computers (with processor and memory) communicating through a generic communication network.  Claim 1 uses only generic computer components such as "communications network," first and second "computing devices," a "request," and an "authorization token."  The specification describes these terms broadly.  *See, e.g.,* D.I. 1-13, '204 Patent at 8:46-48 (network medium may be any network medium over which computing devices desire to communicate), 4:21-23 ("token" is defined as "a data object or structure representing access control criteria and operations that is verifiable or can be authenticated"), 4:24-26 ("resources" are "any item, data, information, or the like, that could be accessible over a communication network").  Using such generic technology to implement the abstract idea of controlling access to resources cannot confer patent eligibility.  *See Prism,* 696 F. App'x at 1017-18 (security system patents lack inventive concept as they "merely recite a host of elements that are indisputably generic computer components" used in a "customary manner").

Nothing in the specification describes any non-conventional technology associated with the token or signature aspects of the claim.  As shown in FIG. 2, the fields in the token are pieces of data, and the specification indicates that it was conventional to use such fields in a token.  *See* D.I. 1-13, '204 Patent at 7:51-53.  The specification also demonstrates that using the signature over

the fields was conventional, citing use of known signatures without any description of how to implement any new or unconventional signature. *See id.* at 7:53-55. Thus, the specification itself shows that none of the claim elements beyond the abstract idea constitute a non-conventional device or process. Nor does the specification support finding an inventive step in an ordered combination of claim elements because the claim steps are arranged in the expected order (a request for a resource followed by a response that provides the authorization for that resource). *See id.* at 1:57-2:3.

Nokia asserts that the claims of the '204 Patent are "directed to novel and unconventional improvements." D.I. 1, ¶ 186. However, Nokia's allegations fall short of identifying any inventive step that could confer patent eligibility. For example, Nokia asserts that the improvement "resides in the fact that the dynamic authority delegation techniques of the invention are applicable to web and non-web applications, without relying on the use of HTTP redirection, and without requiring multiple round trips for obtaining delegated authorization" and that the invention "results in less complex authority delegation techniques that are applicable to web and non-web applications, do not rely on the use of HTTP redirection, and do not require multiple round trips." *Id.* at ¶ 186-190. Even if Nokia could tie its allegations to claim limitations, those allegations are just applying the abstract idea itself using standard, conventional requests and responses and token technology. Merely implementing the abstract idea itself cannot constitute an inventive step that confers patent eligibility. *See BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290-91 (Fed. Cir. 2018) ("[i]f a [patent] claim's only 'inventive concept' is the application of an abstract idea using conventional and well-understood techniques, the claim has not been transformed into a patent-eligible application of an abstract idea"). Because there is no "inventive step" in claim 1, it also fails at the second step of the *Alice* test.

**B.    The Numbering Patents Are Invalid under 35 U.S.C. § 101**

1.    ***Alice* Step One: the Numbering Patents Are Directed to the Abstract Idea of a Numbering Scheme for Organizing Data (Image Frames)**

The Numbering Patents are directed to the abstract idea of organizing data by sequentially numbering certain image frames.  As described above, claim 1 of the '321 Patent is directed to a numbering scheme for each of the image frames in a sequence of frames.  The numbering scheme simply increments the image number by one for each frame and then restarts for each new sub-sequence.  *See* D.I. 1-4, '321 Patent at 8:18-23 ("within each sub-sequence, the video frames of the sub-sequence are given image numbers, using for example consecutive numbering that starts with the number 0 given to the first video frame of the sub-sequence"); FIG. 2.

The '321 Patent specification confirms that claim 1 is implemented in a conventional encoding process.  The specification explains that the method is carried out "in a video encoder . . . which may be any known video encoder" such as an encoder according to the H.263 or H.264 standards.  *Id.* at 21:26-28.  The encoding of the indication for the first image can be done using a variety of conventional techniques known in video coding.  *See id.* at 19:35-36 (describing "many alternatives for adding image frame identifier data to a video sequence that is to be transmitted," including those in ITU standards), 23:4-5, 7 (identifier can be included in a "separate flag" or "encod[ed] into the video sequence").  The specification shows that "resetting" the value requires nothing more than restarting the numbering at "0" at every I-frame.  *See id.* at 8:38-40; FIGS. 2-7 (showing every I-frame having an image number of 0).

Likewise, claim 1 of the '005 Patent is directed to "indicating an encoding order" so that the reference pictures are each numbered sequentially without regard to how many non-reference pictures (if any) fall between them.  As the specification explains, "each reference picture is . . . associated with a sequence number," and in the preferred embodiment, "the indicator is

incremented by one each time a reference picture is encoded." D.I. 1-6, '005 Patent at 4:13-17. The specification also states that it is a "preferred implementation" of the claimed invention to implement it where the "video signal is encoded according to the H.263 standard and the indicator is included in the Supplemental Enhancement Information." *Id.* at 4:43-47. As the specification states, the invention "is applicable to any video coding protocol in which temporal prediction may be used." *Id.* at 14:63-65. The specification describes many ways in which conventional encoding can be used to implement the claimed numbering scheme. *See id.* at 19:34-55. The dependent claims confirm the use of conventional techniques. *See id.* at 15:20-21 (sequence indicator is included in a picture header), 15:24-26 (sequence indicator is included in the Supplemental Enhancement Information of a H.263 standard bit stream). Thus, the specification itself shows that claim 1 is implemented using conventional encoding processes.

Attaching sequence indicators to organize data is an abstract idea. *See In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d at 613 ("attaching classification data, such as dates and times, to images for the purpose of storing those images in an organized manner" is abstract). Because both claim 1 of the '321 Patent and claim 1 of the '005 Patent are directed to organizing (*i.e.*, numbering) the video frames in a sequence, they fail *Alice* step one.

## 2. *Alice* Step Two: the Representative Claims of the Numbering Patents Do Not Contain an Inventive Step

Neither the '321 Patent nor the '005 Patent representative claims include an "inventive step" as required at step two of the *Alice* test. The numbering schemes that are the focus of both the '321 and '005 Patents do not change how the encoding process works and are used in "a typical multimedia streaming system." D.I. 1-4, '321 Patent at 6:10-12. Indeed, the claims themselves recognize that the claimed numbering scheme can simply be included in the information that is sent during the conventional encoding process. *See id.* at 22:57-23:2; D.I. 1-6, '005 Patent at 15:2-

17.  Nor is there any novel arrangement of the elements in the representative claims that could be an inventive step.  In both the '321 and '005 Patents, the representative claims use a standard approach to determine when the numbering starts, ends, or is reset, and include the simplest of number schemes (*i.e.*, 1, 2, 3. . . ).  *See, e.g.*, D.I. 1-4, '321 Patent at 23:1-2 (assigning values in decoding order and resetting the identifier value for first image frame of sequence); D.I. 1-6, '005 Patent at 15:11-19 (consecutive pictures are assigned sequence indicator values that differ by a predetermined amount, which amount can be one).

The Federal Circuit's holding in *Intell. Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315 (Fed. Cir. 2017) is instructive.  The claims at issue involved using tags to create an index to locate information within a computer database.  Significantly, in *Erie*, the tags associated with each record had a metafile which included information about the tag, "such as its relationship to other tags and its place in the index's hierarchical structure."  *Id*. at 1326.  The patent-at-issue purported to improve "computer database search technology" by using an efficient index.  *Id.* at 1327.  The Federal Circuit nonetheless found that the claims failed the second step of the *Alice* test because "the claimed steps recite no more than routine steps involving generic computer components and conventional computer data processing activities to accomplish the well-known concept of creating an index and using that index to search for and retrieve data."  *Id.* at 1329.  The representative claims of both Numbering Patents embody the same concept as the indexing patent in *Erie* but on a simpler level – the claims are directed to organizing images in a group by assigning them numbers in a sequential order.  While the representative claims of the '321 and '005 Patents apply this idea to different sets of images, the lack of an inventive step is the same.

Like the patentee in *Erie*, Nokia alleges, in largely conclusory terms, that these claims contain an inventive step.  But those allegations are insufficient as a matter of law, because the

asserted advantages are all attributable to the implementation of the abstract idea itself rather than to any technological improvement. *See BSG Tech LLC*, 899 F.3d at 1288, 1290-91 (claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention "significantly more" than that ineligible concept). For example, Nokia alleges that the '321 Patent facilitates random access by enabling decoders to detect frames in the middle of a video stream that requires no earlier frames to decode. *See* D.I. 1, ¶¶ 92-93. Even ignoring Nokia's admission in its (earlier) '005 Patent that I-frames themselves already provide this "random access" function (D.I. 1-6, '005 Patent at 2:4-7), such advantages are not technological improvements but are the natural result of the abstract idea of organizing the frames using sequential numbers. It is also easier to start reading in the middle of a book at a page marked Chapter 3 or Chapter 4, yet that would not be a patentable invention. Moreover, any alleged advantage happens at the decoder in the use case of starting a video in the middle, which is not recited in the representative claim. Likewise, the advantages described for the '005 Patent are framed by Nokia as "error detection" although the only contribution to error detection is the use of numbering the reference pictures to allow the decoder to better detect whether one is missing. D.I. 1 at ¶¶ 114-16. This abstract idea has been used for generations. For as long as teachers have been requiring children to "count off" on a field trip to make sure everyone is accounted for, this concept has been used to check for lost children. Here, the known advantages of organizing information with numbering schemes cannot supply an "inventive step" to establish patentability. *See BSG Tech LLC*, 899 F.3d at 1290-91.

Because there is no "inventive step" associated with either of the representative claims, both the '321 and '005 Patents fail the second step of the *Alice* test.

### C.    The '450 Patent Is Invalid under 35 U.S.C. § 101

#### 1.    *Alice* Step One: Claim 31 is Directed to the Abstract Ideas of Using Mathematical Concepts in Video Compression

Encoding video content is an abstract idea that is not patent eligible.  *See Adaptive Streaming Inc. v. Netflix, Inc.,* 836 F. App'x 900, 903 (Fed. Cir. 2020) ("encoding and decoding image data . . . are by themselves abstract ideas").  Claim 31 is directed to implementing encoding by using a particular set of equations: (1) "simplifying a predetermined transform matrix to require less operations when applied to digital data," (2) approximating the irrational numbers in the simplified transform matrix "by rational numbers," and (3) "to compensate for these measures, a predetermined quantization is extended to include the operations which were removed in the simplification of the predetermined transform matrix."  D.I. 1-7, '450 Patent at 5:17-33.  But simplifying a matrix, approximating numbers, and quantization are themselves abstract mathematical concepts that cannot be patented.  *See RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1328 (Fed. Cir. 2017) ("a mathematical equation that simply changes the data into other forms of data cannot save" the claim from being abstract); *SAP Am., Inc.*, 898 F.3d at 1167 ("selecting certain information, analyzing it using mathematical techniques, and reporting or displaying the results of the analysis … is all abstract").  Using one set of abstract ideas (math) in the context of another astract process (video encoding) does not tranform those abstract ideas into a patent-eligible matter.  *RecogniCorp, LLC*, 885 F.3d at 1327 ("Adding one abstract idea . . . to another abstract idea . . . does not render the claim non-abstract").

The specification explains that using a sequence of discrete cosine transform ("DCT") and quantization to compress digital data was "known from the state of the art."  D.I. 1-7, '450 Patent at 1:22-23.  Specifically, "a compression of digital image data is commonly achieved by using a DCT followed by a quantization of the DCT coefficient obtained by the DCT."  *Id*. at 1:25-27.

Thus, the specification recognizes that the tools of encoding, including use of a transform matrix (DCT) and quantization, were conventional. *See also* FIG. 2 (showing standard encoder with a DCT Transformer and a Quantization Means).

Because it claims the use of mathematical concepts, implemented within the context of the conventional encoding process, claim 31 is directed to an abstract idea at *Alice* step one.

### 2. *Alice* Step Two: Claim 31 Does Not Contain an Inventive Step

As described above, claim 31 requires nothing more than implementing mathematical operations that (1) simplify the matrix; (2) approximate the irrational numbers in the matrix by rational numbers; and (3) adjust the quantization to account for the impact of steps 1 and 2. Claim 31 does not require that simplification or approximation be implemented in a particular way. The specification explains that the simplification can occur in multiple ways by using different equations to factor the matrix. *See* D.I. 1-7, '450 Patent at 10:44-11:31 (two separate sets of equations can be used to simplify, either of which will result in the claimed simplified matrix). The specification describes that the invention "proceeds from the idea that the number of operations required for a DCT can be reduced significantly" by implementing the two steps of simplifying the matrix and approximating the irrational numbers, along with the addition that the "approximation is compensated" for in the decoding process. *Id*. at 5:54-63. The specification then states that one advantage of the invention is "enable[ing] a fast computation of the transform since it enables a reduction of the number of required operations . . . thus saving processor time." *Id.* at 5:64-67. The specification explains that the invention "can be employed for the compression of any kind of digital data for any purpose." *Id.* at 7:33-34.

All the alleged benefits of this method arise from the claimed abstract ideas, not from the other elements of the claim. Nokia asserts that the alleged inventive step is the use of a particular method for simplifying the matrix and approximating the irrational numbers by a

rational value whose denominator is a power of two (a limitation that is not included in claim 31) and then accounting for that simplification and approximation in the quantization process. *See* D.I. 1, ¶ 122. But even if Nokia's characterization of claim 31 were accurate, using equations that allow for simpler or fewer calculations is a basic mathematical concept that does not constitute a technological improvement in the encoding process technology itself. By using a mathematical equation with fewer operations, for example, it follows as a matter of course that the computer will save processor time because there are fewer calculations to process. Likewise, using numbers divisible by two makes for easier math on a computer but that is not an improvement in the computer's operation.

The Federal Circuit has been clear that such benefits that arise from the abstract idea itself are not an inventive step rendering the claims patent eligible. *See In re Bd. of Trs. of Leland Stanford Junior Univ.*, 991 F.3d 1245, 1251 (Fed. Cir. 2021) ("[t]he different use of a mathematical calculation, even one that yields different or better results, does not render patent eligible subject matter"); *In re Gitlin*, 775 F. App'x 689, 691 (Fed. Cir. 2019) ("calling for a mathematical concept to be performed more efficiently . . . does not amount to an application of the mathematical concept that is patent-eligible"); *RecogniCorp, LLC*, 855 F.3d at 1328 ("[t]he addition of a mathematical equation that simply changes the data into other forms of data cannot save" the claim from being abstract). Because all the claimed benefits arise from the abstract mathematical concepts themselves, not any technological advance, claim 31 fails at *Alice* step two.

## VI.    CONCLUSION

For the reasons set forth above, Paramount respectfully requests that the Court grant their motion to dismiss counts IV, VI, VII, and XIII of Nokia's Complaint because the Challenged Patents are invalid under 35 U.S.C. § 101 for lack of patentable subject matter.

ASHBY & GEDDES

*/s/ John G. Day*

*Of Counsel:*

Sharon L. Davis
Jennifer Maisel
Kristen Logan
Bryan Thompson
ROTHWELL, FIGG, ERNST & MANBECK, P.C.
901 New York Ave., N.W., Suite 900 East
Washington, DC 20001
(202) 783-6040

Dated: October 16, 2025

_____

John G. Day (#2403)
Brian A. Biggs (#5591)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
jday@ashbygeddes.com
bbiggs@ashbygeddes.com

*Attorneys for Defendants*