# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

**NOKIA TECHNOLOGIES OY,**

                **Plaintiff,**

      **v.**

**PARAMOUNT SKYDANCE CORPORATION, PARAMOUNT GLOBAL, and PARAMOUNT STREAMING SERVICES, INC.,**

                **Defendants.**

**Civil Action No. 25-cv-1054-GBW**

**JURY TRIAL DEMANDED**

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Dated: November 13, 2025

Of Counsel

Warren Lipschitz
wlipschitz@mckoolsmith.com
Erik Fountain
efountain@mckoolsmith.com
Alexander J. Chern
achern@mckoolsmith.com
Kyra Cooper
kcooper@mckoolsmith.com
**MCKOOL SMITH, P.C.**
300 Crescent Court Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000

R. Mitch Verboncoeur
mverboncoeur@mckoolsmith.com
Joshua Budwin
jbudwin@mckoolsmith.com
**MCKOOL SMITH, P.C.**
303 Colorado Street, Suite 2100
Austin, TX 78701
Telephone: (512) 692-8752

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
**FARNAN LLP**
919 North Market Street, 12th Floor
Wilmington, DE 19801
Phone: (302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

# TABLE OF CONTENTS

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................1

II.     LEGAL STANDARDS ................................................................................................1

III.    ARGUMENT ...............................................................................................................1

        A.      The '204 Patent is Directed to Patent-Eligible Subject Matter............................1

                1.      Step One – The '204 Patent is Directed to Non-Abstract Subject
                        Matter............................................................................................................3

                        a.      Paramount Oversimplifies the Claims of the '204 Patent...............3

                        b.      The '204 Patent Claims Are Directed to Specific
                                Verification Methods that Improve Computer Technology.............4

                2.      Step Two – The '204 Patent Includes Limiting Inventive Concepts...........6

        B.      The '321 Patent is Directed to Patent-Eligible Subject Matter................................6

                1.      Step One - The '321 Patent is Directed to Non-Abstract Subject
                        Matter............................................................................................................8

                        a.      Paramount Oversimplifies the Claims of the '321 Patent...............8

                        b.      The '321 Patent Claims Are Directed to Specific Encoding
                                Methods that Improve Computer Technology.................................8

                2.      Step Two - The '321 Patent Includes Limiting Inventive Concepts..........10

        C.      The '005 Patent is Directed to Patent-Eligible Subject Matter............................11

                1.      Step One - The '005 Patent is Directed to Non-Abstract Subject
                        Matter..........................................................................................................13

                        a.      Paramount Oversimplifies the '005 Patent Claims.......................13

                        b.      The '005 Patent Claims Are Directed to Specific Encoding
                                Methods that Improve Computer Technology...............................13

                2.      Step Two - The '005 Patent Includes Limiting Inventive Concepts..........14

        D.      The '450 Patent is Directed to Patent-Eligible Subject Matter............................15

                1.      Step One - The '450 Patent is Directed to Non-Abstract Subject
                        Matter..........................................................................................................16

                        a.      Paramount Oversimplifies the Claims of the '450 Patent.............16

                        b.      The '450 Patent Claims Are Directed to Improvements to
                                Computer Processing for Discrete Cosine Transform
                                ("DCT"). .....................................................................................17

                2.      Step Two – The '450 Patent Includes Limiting Inventive Concepts.........18

        E.      At A Minimum, Step Two Raises Plausible Fact Disputes ..................................20

IV.     CONCLUSION............................................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*Adasa Inc. v. Avery Demnison Corp.*,
  55 F4th 900 (Fed. Cir. 2022) ................................................................... 9

*Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*,
  841 F.3d 1288 (Fed. Cir. 2016) ....................................................... 11, 15

*BASCOM Global Internet Services, Inc. v. AT&T Mobility LLC*,
  827 F.3d 1341 (Fed. Cir. 2016) ........................................................... 6, 15

*Berkheimer v. HP Inc.*,
  881 F.3d 1360 (Fed. Cir. 2018) ............................................................... 1

*Cal. Inst. of Tech. v. Broadcom Ltd.*,
  25 F.4th 976 (Fed. Cir. 2022) ............................................................... 17

*Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004) ................................................................... 1

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
  927 F.3d 1306 (Fed. Cir. 2019) ........................................................... 6, 10

*Coop. Entm't, Inc. v. Kollective Tech., Inc.*,
  50 F.4th 127 (Fed. Cir. 2022) ............................................................. 6, 20

*Cosmokey Sols. GMBH & Co. v. Duo Sec. LLC*,
  15 F.4th 1091 (Fed. Cir. 2021) ................................................... 3, 4, 8, 17

*DDR Holdings, LLC v. Hotels.com, L.P.*,
  773 F.3d 1245 (Fed. Cir. 2014) ............................................................. 15

*Enfish, LLC v. Microsoft Corp.*,
  822 F.3d 1327 (Fed. Cir. 2016) ....................................................... passim

*Ericsson Inc. v. TCL Commun. Tech, Holdings Ltd.*,
  955 F.3d 1317 (Fed. Cir. 2020) ............................................................... 5

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
  879 F.3d 1299 (Fed. Cir. 2008) ............................................................... 4

*Illumina, Inc. v. Ariosa Diagnostics, Inc.*,
  967 F.3d 1319 (Fed. Cir. 2020) ............................................................... 1

*In re TLI Commc'ns LLC Pat. Litig.*,
    823 F.3d 607 (Fed. Cir. 2016)............................................................................ 8, 9, 14

*Int'l Bus. Machs. Corp. v. The Priceline Grp. Inc.*,
    No. 15-cv- 137, 2016 WL 626495 (D. Del. Feb. 16, 2016)...................................... 3

*Intell. Ventures I LLC v. Erie Indem. Co.*,
    850 F.3d 1315 (Fed. Cir. 2017)................................................................................ 11

*Redwood Techs., LLC v. Netgear, Inc.*,
    2024 WL 4591852 (D. Del. Oct. 28, 2024) ................................................... 3, 8, 17

*Solutran, Inc. v. Elavon, Inc.*,
    931 F.3d 1161 (Fed. Cir. 2019).................................................................................. 6

*TecSec, Inc. v. Adobe Inc.*,
    978 F.3d 1278 (Fed. Cir. 2020)............................................................................ 1, 11

*Universal Secure Registry LLC v. Apple Inc.*,
    10 F.4th 1342 (Fed. Cir. 2021) .................................................................................. 5

*Voiceage EVS LLC v. HMD Glob. Oy*,
    No. CV 19-1945-GBW, 2025 WL 1397239 (D. Del. May 14, 2025) ........................ 3

## TABLE OF EXHIBITS[1]

| Ex. No. | Description |
|---|---|
| 1. | Notice of Allowance, Application No. 12/723,049 (U.S. Patent No. 8,776,204), February 27, 2014 |
| 2. | *Certain Video Capable Electronic Devices*, Inv. No. 337-TA-1380, Order No. 41 |
| 3. | *Certain Video Capable Electronic Devices*, Inv. No. 337-TA-1380, Initial Determination |

---

[1] All exhibits listed in the Table of Exhibits are attached to the accompanying Declaration of Joshua Budwin.

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Paramount's partial motion to dismiss mischaracterizes Nokia's allegations and the challenged patents. Paramount alleges "Nokia's infringement claims primarily rely on a well-established video streaming standard known as the AVC or H.264 standard." Op. Br. at 1. This is incorrect. First, the infringement allegations against Paramount's encoding processes do not rely on the H.264 Standard. Second, Paramount's mischaracterizations of Nokia's Complaint cannot escape the fact that the H.264 decoding standard[2] by its own terms does not specify an "encoding process." Compl. at ¶¶ 271-279. For each challenged patent, Paramount also provides genericized characterizations that "disregard elements of the claims at issue that the specification makes clear are important parts." *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1294 (Fed. Cir. 2020).[3]

## II.    LEGAL STANDARDS

A court may grant a motion to dismiss only if, accepting the pleaded allegations as true, and drawing all reasonable inferences in plaintiff's favor, it is beyond doubt that the plaintiff can prove no facts in support of a claim. *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 143 (3d Cir. 2004). Eligibility is a question of law, underlying facts must be shown by clear and convincing evidence. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). Defendants bear the burden. *Illumina, Inc. v. Ariosa Diagnostics, Inc.*, 967 F.3d 1319, 1328 (Fed. Cir. 2020).

## III.    ARGUMENT

### A.    The '204 Patent is Directed to Patent-Eligible Subject Matter

The '204 Patent is directed to novel and unconventional improvements that enable dynamic delegation of authority such that applications (e.g., mashups and third-party applications) on communication networks (e.g., World Wide Web or in Next Generation networks) can provide

---

[2] The H.264 standard is not a "streaming standard" as Paramount contends. Op. Br. at 1.

[3] Nokia does not dispute Paramount's description of the procedural posture of the case.

access to protected resources by entities other than the resource owner. '204 Patent at 1:51-56; D.I. 1 at ¶¶ 186, 190. Problems arise "when the user is required to give his/her credentials (username and password) for one source to another source, thus exposing information between sources and giving one source full access to the other source. This may not be desirable to the user." *Id.* at 1:26-30; D.I. 1 at ¶ 187. A prior protocol known as OAuth attempted, but failed, to provide a solution to this problem. *Id.* at 1:32-44; D.I. 1 at ¶ 188. The '204 Patent overcame these technical challenges by inventing a new method for authority delegation by a resource residence. *See id.* at 4:35-45; 5:12-16; Figure 1; D.I. 1 at ¶ 189. According to claim 1, the "authentication token" sent by the "resource owner" to the "resource requestor" "serv[es] as a proof of authorization delegated by the resource owner to be presented by the resource requestor to the resource residence so as to permit the resource requestor to access the one or more requested resources stored in the resource residence." *Id.* at 9:55-59. The "authorization token" comprises a verifiable structure comprising:

> one or more fields, the one or more fields comprising at least one of: a method to be used by the resource residence for authenticating the resource requestor; and a strength of the method to be used by the resource residence for authenticating the resource requestor; and

> a signature computed over the one or more fields, the signature being computed utilizing a private key of the resource owner.

*Id.* at 9:60-10:3.

The claims were allowed because the prior art did not disclose an authorization token, sent from the resource owner to the resource requestor, that "comprises a verifiable structure comprising: one or more fields, the one or more fields comprising at least one of: a method <u>to be used by the resource residence</u> for authenticating the resource requestor; and a strength of the method <u>to be used by the resource residence</u> for authenticating the resource requestor." Notice of

Allowability, at 3; Exhibit 1 (emphasis in original).[4] Paramount's assertion that "[t]he '204 Patent does not purport to invent, nor do the claims require, any novel 'field' or 'signature' algorithm" (D.I. 9 (Motion) at 4) is incorrect—the fields of the authorization token are novel.

### 1.    Step One – The '204 Patent is Directed to Non-Abstract Subject Matter

#### a.    Paramount Oversimplifies the Claims of the '204 Patent

The court must avoid describing the claims "at too high a level of abstraction" and "untethered from the language of the claim," because to do so would "all but ensure[] that the exceptions to § 101 swallow the rule." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016); *Voiceage EVS LLC v. HMD Glob. Oy*, No. CV 19-1945-GBW, 2025 WL 1397239, at *10 (D. Del. May 14, 2025) ("[a] patent challenger 'must articulate with specificity what the claims are directed to.'") "Courts in this district regularly deny motions to dismiss based on patent ineligibility under § 101 when the defendant's proffered abstract idea fails to satisfactorily capture the substance of the claims." *Redwood Techs., LLC v. Netgear, Inc.*, 2024 WL 4591852, at *5 (D. Del. Oct. 28, 2024). In *Cosmokey Sols. GMBH & Co. v. Duo Sec. LLC*, 15 F.4th 1091, 1097 (Fed. Cir. 2021), the district court's "broad characterization" of the claims as being "directed to the abstract idea of authentication—that is, the verification of identity to permit access to transactions" was incorrect. *Id.* Instead, "the claims and written description suggest . . . the claimed advance is activation of the authentication function, communication of the activation within a predetermined time, and automatic deactivation of the authentication function, such that the invention provides enhanced security and low complexity with minimal user input." *Id.*

Paramount's characterization of the claims of the '204 Patent as merely being "directed to the abstract idea of controlling access to resources" (D.I. 9 at 12) is overly broad and incorrect.

---

[4] "[A] court may take judicial notice of a patent's prosecution history." *Int'l Bus. Machs. Corp. v. The Priceline Grp. Inc.*, No. 15-cv- 137, 2016 WL 626495, *20 n.18 (D. Del. Feb. 16, 2016).

Paramount ignores the limitations of all claims requiring that the authorization token sent from the resource owner to the resource requestor includes "one or more fields comprising at least one of: a method *to be used by the resource residence* for authenticating the resource requestor; and a strength of the method *to be used by the resource residence* for authenticating the resource requestor." '204 Patent at 9:53-66 (emphasis added). The examiner found these limitations material to patentability (Exhibit 1 at 3). The Court cannot ignore them in its analysis.

### b. The '204 Patent Claims Are Directed to Specific Verification Methods that Improve Computer Technology

The Federal Circuit has found claims that are directed to specific verification methods that depart from earlier approaches and improve computer technology to be patent eligible. *Cosmokey*, 15 F.4th at 1096. In *Ancora*, 908 F.3d at 1348-49, the court stated that "[i]mproving security . . . can be a non-abstract computer functionality improvement if done by a specific technique that departs from earlier approaches to solve a specific computer problem." *Id.* at 1349 (citing *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1304-05 (Fed. Cir. 2008)). The claimed security method was not directed to an abstract idea, because it: (i) "specifically identifies how that functionality improvement is effectuated in an assertedly unexpected way"; and (ii) addressed "a technological problem with computers: vulnerability of license-authorization software to hacking." *Id.* The court referred to the examiner's reasons for allowance, which relied on the claimed use of "an agent to set up a verification structure in the erasable, non-volatile memory of the BIOS." *Id.*

Here, the claims of the '204 Patent, like those in *Ancora*, are directed to specific improvements in computer security that are effectuated in an unexpected way—a resource owner sending an authorization token to a resource requestor that "serv[es] as a proof of authorization delegated by the resource owner to be presented by the resource requestor to the resource residence" where the authorization token "comprises a verifiable structure comprising: one or

more fields, the one or more fields comprising at least one of: a method ***to be used by the resource residence*** for authenticating the resource requestor; and a strength of the method ***to be used by the resource residence*** for authenticating the resource requestor." '204 Patent at 9:53-66 (emphasis added); Exhibit 1 at 3. The result is an improvement in user resource authorization that, among other things, avoids the requirement that a user give his/her credentials (username and password) for one source to another source. '204 Patent at 1:26-30.

Paramount contends that the '204 Patent claims are analogous to the claims in *Ericsson Inc. v. TCL Commun. Tech, Holdings Ltd.*, 955 F.3d 1317, 1326 (Fed. Cir. 2020) which the court found to be directed to "the abstract idea of controlling access to, or limiting permission to, resources." D.I. 9 at 11. In *Ericsson*, the court found the four components of the claims collapsed into simply "an access controller for controlling access" by "receiving a request" and then "determining if the request should be granted," which is a "bare abstract idea." *Ericsson*, at 1326. The *Ericsson* court analogized the claims to a library card or a key fob, wherein "a request is made for access to a resource, that request is received and evaluated, and then the request is either granted or not." *Ericsson* at 1327. Here, no such analogy is possible. The claims are not directed to presenting the authorization token to the resource residence so that the resource residence can decide whether to grant authorization. The claims are directed to the authorization token, requiring that it be provided to the resource requestor by the resource owner and include one or more fields comprising the method, and/or strength of the method, to be used by the resource residence for authenticating the resource requestor—the very things the examiner found missing in the prior art.

Paramount further contends that the '204 Patent claims are analogous to the claims found to be abstract in *Universal Secure Registry LLC v. Apple Inc.*, 10 F.4th 1342 (Fed. Cir. 2021). D.I. 9 at 11-12. There, the claims were abstract, because they "simply recite[d] conventional actions in

a generic way" (e.g., receiving a transaction request, verifying the identity of a customer and merchant, allowing a transaction) and "do not purport to improve any underlying technology." *Universal Secure* at 1349 (quoting *Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161, 1168 (Fed. Cir. 2019)). The '204 Patent claims provide improvements to secure dynamic delegation of authority.

### 2.  Step Two – The '204 Patent Includes Limiting Inventive Concepts

The '204 Patent claims satisfy step two, as they recite specific technical solutions that are inventive concepts, i.e., they reflect "something more than well-understood, routine, conventional activities previously known to the industry." *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1315 (Fed. Cir. 2019). This is evident from the examiner's finding that the prior art fails to teach the claimed authorization token (Exhibit 1 at 3). *See Coop. Entm't, Inc. v. Kollective Tech., Inc.*, 50 F.4th 127, 133 (Fed. Cir. 2022). ("[W]e conclude that claim 1 recites a specific technical solution that is an inventive concept. . . which did not exist in the prior art").

Paramount ignores the examiner's finding and instead contends the claims of the '204 Patent add nothing inventive because they use generic, conventional technology. D.I. 9 at 12-13. Generic computer components and functions can contain inventive steps. As in *BASCOM*, the claims at-issue here are patent-eligible because they recite "a specific, discrete implementation of the abstract idea of filtering content," even though the claims recited "generic computer, network and Internet components, none of which is inventive by itself." *BASCOM Global Internet Services, Inc. v. AT&T Mobility LLC,* 827 F.3d 1341, 1350 (Fed. Cir. 2016).

### B.  The '321 Patent is Directed to Patent-Eligible Subject Matter

In the 1380 Investigation, ALJ Cameron Elliot rejected the same argument that Paramount makes here: that the '321 Patent is directed to the abstract idea of "a numbering scheme." *Compare* D.I. 9 at 14 *with Certain Video Capable Electronic Devices*, Inv. No. 337-TA-1380, Order No. 41 at 3 ("nothing more than a numbering scheme") (Exhibit 2). Twice, ALJ Elliot correctly rejected

this argument because of the "body of Section 101 jurisprudence that holds inventions directed to improving the functionality of a computer pass *Alice* step one." *Id*. at 4 (citations omitted); *Certain Video Capable Electronic Devices*, Inv. No. 337-TA-1380, Initial Determination ("ID") at 47-49 (Exhibit 3). ALJ Elliot determined that "[t]he clear aim of the 321 patent claims is to improve a computer's ability to decode video streams; *i.e.*, an improvement to the way computers function held to be non-abstract in *Enfish* and its progeny." *Id.* at 48 (citations omitted).

Prior to the '321 Patent, motion compensated prediction methods in Group of Pictures (GOP) based systems typically relied on reference pictures immediately prior to a predicted picture in decoding order (or immediately prior and following a bi-predicted picture). '321 Patent at 2:34-55. A technique called reference picture selection allowed predictions from reference pictures other than those immediately preceding the predicted picture in the time domain (or immediately succeeding for bi-predicted pictures). *Id*. at 3:37-61. However, there were unresolved drawbacks. Random access was inflexible, and decoders were required to parse and buffer extensively to detect dependencies between pictures. *Id*. A significant problem also occurred when a user wanted to stream or browse a video from somewhere other than the beginning. '321 Patent at 3:62-4:4. Prior systems did not include an indication that allowed the decoder to recognize the first I-frame (i.e., a non-motion-compensated, non-temporal predicted frame) in an independent sequence of pictures. *Id*. at 11:11-21. When streaming or browsing a digital video from a point other than the beginning, the decoder would interpret the non-beginning starting position as an unintentional loss of image frames and would try to reconstruct the image frames suspected as lost. *Id*. at 11:20-25.

The '321 Patent overcame these technical challenges in the prior systems by inventing a novel encoding technique. The '321 Patent employs the unconventional solution of encoding into the video sequence an indication of at least one image frame, which is the first image frame, in

decoding order, of an independent sequence and resetting the identifier value for the indicated first image frame of the independent sequence. *Id.* at 4:16-35, 22:63-23:2; *see also* D.I. 1 at 93-96. This allows the encoder to identify to the decoder random access points in the bitstream and ensure resiliency in the bitstream in the case that data is lost in transmission. *Id*. at 4:16-38.

### 1.   Step One - The '321 Patent is Directed to Non-Abstract Subject Matter

#### a.   Paramount Oversimplifies the Claims of the '321 Patent

Paramount oversimplifies the '321 Patent's claims by grouping them together with the unrelated '005 Patent and contending that these patents are "directed to the abstract idea of a numbering scheme for organizing data (image frames)."[5] D.I. 9 at 14. Paramount's oversimplification impermissibly describes the claims "at too high a level of abstraction" that is "untethered from the language of the claims." *Enfish*, 822 F.3d at 1337; *Redwood Techs.*, 2024 WL 4591852, at *5. Paramount's "numbering scheme" oversimplification also ignores important claim limitations, including that the claimed encoding method encodes "into the video sequence video sequence an indication of at least one image frame, which is the first image frame, in decoding order, of the independent sequence" and resets "the identifier value for the indicated first image frame of the independent sequence." '321 Patent at 22:58-23:2; *see e.g. Cosmokey*, 15 F.4th at 1097; *Redwood Techs.*, 2024 WL 4591852, at *5.

#### b.   The '321 Patent Claims Are Directed to Specific Encoding Methods that Improve Computer Technology

Relying on its simplified description, Paramount contends that, under *In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 613 (Fed. Cir. 2016), "[a]ttaching sequence indicators to organize

---

[5] The '321 Patent provides for efficient random access including identifying starts of independent sequences, while the '005 Patent provides a mechanism for detecting lost reference pictures.

data is an abstract idea," and because claim 1 of the '321 Patent . . . is directed to "organizing (*i.e.*, numbering) the video frames in a sequence, [it] fail[s] *Alice* step one." D.I. 9 at 15.

The *TLC Commc'ns* case was different. In *TLI Commc'ns*, unlike here, the claims were not directed to a specific improvement to computer functionality. The problem being solved by the patent-at-issue in *TLC Commc'ns* was not a technical, computer-functionality problem, but, rather, the patent taught "manually or automatically assigning 'classification data,' such as a date or timestamp, to digital images and sending those images to a server. The server then extracts the classification data and stores the digital images, 'taking into consideration the classification information.'" *TLI Commc'ns*, 823 F.3d at 610. This was adding conventional computer components to a well-known practice (archiving images). *See id*. at 612. The Federal Circuit noted that the problem facing the *TLI* inventor was not, among other things, "how to transmit images via a cellular network." *Id*. By contrast, the '321 Patent is about "how to transmit" digital video and improves a computer's ability to encode video.

The claims of the '321 Patent are analogous to the claims held to be patentable by the Federal Circuit in *Adasa Inc. v. Avery Demnison Corp.*, 55 F4th 900, 908-09 (Fed. Cir. 2022). In *Adasa*, the claims were directed to an RFID serial number wherein an additional data field is added to the prior art serial number space which must uniquely correspond to an allocated block of serial numbers. *Id.* at 909. This "unique correspondence" provides the technical benefit of permitting "unique serial numbers to be assigned without need for a continuous database connection, reducing associated network delays and allowing encoders to operate on-demand." *Id.* As in *Adasa*, the claimed unconventional solution of encoding into the video sequence an indication of at least one image frame, which is the first image frame, in decoding order, of the independent sequence, provides a specific technological improvement to the functionality and capabilities of video

encoding technology that results in increased resiliency and improved video playback, particularly in random access scenarios in systems with flexible allocation of reference pictures. *See* '321 Patent at 4:48-58; 4:64-5:5; D.I. 1 at ¶¶ 93-95.

### 2. Step Two – The '321 Patent Includes Limiting Inventive Concepts

The '321 Patent claims satisfy step two, as they recite specific technical solutions that are inventive concepts, i.e., reflect "something more than well-understood, routine, conventional activities previously known to the industry." *Cellspin*, 927 F.3d at 1315. Paramount claims "Nokia alleges that the '321 Patent facilitates random access by enabling decoders to detect frames in the middle of a video stream that requires no earlier frames to decode." D.I. 9 at 22 (citing D.I. 1 at ¶¶ 92-93). Paramount then asserts that "any alleged advantage happens at the decoder in the use case of starting a video in the middle, which is not recited in the representative [encoding] claim." D.I. 9 at 22. The idea that the benefits seen at a decoder cannot be present in an encoding patent claim is a false dichotomy—an encoder encodes video, and then users with decoding devices decode the video. A central purpose of encoding is to compress data representing video for better transmission to decoding devices, which leads to superior video playback experiences.

The '321 Patent provides a better way of doing this that was not well-understood, routine, or conventional. This is evident from the '321 Patent's specification, which recognized a need for an improved, more flexible random access. *See* '321 Patent at 3:56-61; *see also id.* at 3:62-63 ("A further problem [that] relates to detection of image frames from which a decoder can start the decoding process."). The shortcomings in the prior art affected a user's ability to seek, fast-forward, or rewind a locally stored file, stream from an arbitrary position in a file (or receive a packet therefrom), and avoid freezing when there is arbitrary loss or corruption in a file (*see id.* at 3:63-4:4). The use of the indication of at least one image frame, which is the first image frame, in decoding order, of the independent sequence, and resetting the identifier value for the indicated

10

first image frame of the independent sequence, as claimed in the '321 Patent, even in an otherwise conventional sequence of motion-compensated, temporally predicted video frames, recites "a specific, discrete implementation" that was not previously known and which is therefore inventive. *See BASCOM,* 827 F.3d at 1350; *see also Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1300-01 (Fed. Cir. 2016).

Again, relying on its oversimplification of the claims as organizing frames using sequential numbers (D.I. 9 at 17), Paramount incorrectly contends that *Intell. Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315 (Fed. Cir. 2017) is "instructive." D.I. 9 at 16. *Intell. Ventures* is distinguishable, as that patent involved merely creating an index and using the index to search for and retrieve data. *Id.* at 1328-29. The patent-at-issue in *Intell. Ventures* admitted that an index is simply "a guide that is used to locate information stored in a database," and the court found that the use of a well-known XML tag was insufficient to transform the claims into a patent eligible invention. *Id.* at 1328. Unlike the generic database indexing in *Intell. Ventures*, the '321 Patent provides specific encoding techniques resulting in a structural modification to video bitstreams that solve a problem unique to digital video coding technology that results in improved random access capabilities in systems with flexible allocation of reference pictures.

## C. The '005 Patent is Directed to Patent-Eligible Subject Matter

As explained above, Paramount improperly lumps the '321 and '005 Patents together, labeling them "the Numbering Patents." *E.g.*, D.I. 9 at 5, 14. This is exactly the type of overgeneralization the Federal Circuit has cautioned against that "disregard[s] elements of the claims at issue that the specification makes clear are important parts." *TecSec, Inc.*, 978 F.3d at 1294. While the '321 Patent provides a solution to random access with flexible allocation of reference pictures through indications of first image frames of independent sequences in bitstreams, the '005 Patent addresses error resiliency through an encoding technique that uses a

scheme to indicate to decoders an encoding order of reference pictures for temporal predictions in an encoded video signal. '005 Patent at cl.1. The reference pictures in the '005 Patent are a distinct concept from an indicated first image frame of an independent sequence in the '321 Patent. '005 Patent 4:3-25 (reference pictures can be "e.g. I-frames and P-frames"); D.I. 1 ¶¶ 113-16.

Before the '005 Patent's invention, encoders could not reliably signal which previously encoded pictures served as temporal references, leaving decoders unable to detect or recover from the loss of a reference picture. '005 Patent 1:48-2:13, 2:29-64, 3:35-62; D.I. 1 ¶¶ 108-12. The specification explains that "the bit-stream does not include information identifying the reference picture," leaving "no means to detect if a reference picture is lost," so errors are "propagated both spatially and temporally" and remain "visible . . . for a relatively long time." '005 Patent 2:8-13, 3:35-39, 3:52-55; D.I. 1 ¶¶ 111-12. The loss of a non-reference frame does not affect the decoder because it is not used as a reference for any other frame. In contrast, losing a reference frame is critical, as any subsequent frame that depends on it cannot be reconstructed correctly. The '005 Patent provides a solution to distinguish the loss of a reference picture from the loss of a non-reference pictures. Without such a mechanism, prior systems suffered cascading prediction errors when a reference picture was lost, forcing decoders to freeze until the next INTRA frame or run costly concealment routines. '005 Patent 2:29-64, 3:56-62; D.I. 1 ¶ 111.

The '005 Patent resolves this problem through a "sequence-indicator" scheme that numbers reference pictures independently from non-reference pictures, enabling the decoder to determine when a missing picture affects later predictions. '005 Patent 4:3-19, cl.1; D.I. 1 ¶¶ 112-13. Each time a reference picture is encoded, the encoder increments the indicator by a fixed amount, preserving temporal relationships regardless of intervening frames. *Id.* This ordered, machine-readable structure allows selective concealment only when needed, improving reliability,

compression efficiency, and resilience to transmission errors. '005 Patent 4:23-37; D.I. 1 ¶¶ 113-16. The claimed "sequence-indicator" is a specific technological improvement in computer implemented video coding, not an abstract idea. *Enfish*, 822 F.3d 1327, 1336-37 (Fed. Cir. 2016).

### 1.    Step One - The '005 Patent is Directed to Non-Abstract Subject Matter

#### a.    Paramount Oversimplifies the '005 Patent Claims

Paramount's step-one argument rests on a mischaracterization. By labeling the '005 Patent a "numbering patent" and asserting its claims "describe nothing more than a numbering scheme," Paramount overgeneralizes and ignores the invention's technical implementation. D.I. 9 at 14-17. The '005 Patent is not about labeling frames; it dictates how an encoder encodes motion in video where some temporally predicted pictures are used as reference pictures through a process executed by a computer. '005 Patent 4:3-25, 4:60-5:25, cl.1; D.I. 1 ¶¶ 112-13. This process improves encoder performance by using "sequence indicators" to identify reference pictures, enhancing error resiliency and compression efficiency—concrete advancements in computer-implemented encoding. *See* '005 Patent 4:23-37, 2:29-64, 3:56-62; D.I. 1 ¶¶ 113, 115-16.

As in *Enfish*, Paramount's abstraction "untethers" the claims from their language. *Enfish*, 822 F.3d at 1337. The claimed method—using a sequence indicator with an independent numbering scheme to mark the encoding order of reference pictures where some temporally predicted pictures can themselves be used as reference pictures—cannot be performed mentally; it requires a computer encoder configured to process and track reference pictures in a digital bitstream. *See* '005 Patent 4:3-19, cl.1; D.I. 1 ¶¶ 115-16.

#### b.    The '005 Patent Claims Are Directed to Specific Encoding Methods that Improve Computer Technology

Before the '005 Patent's invention, "there [was] no means to detect if a reference picture is lost" because "the bit-stream does not include information identifying the reference picture," so

errors are "propagated both spatially and temporally" and remain visible "for a relatively long time." '005 Patent 2:8-13, 3:35-39, 3:52-55; D.I. 1 ¶¶ 111-12. The '005 Patent addresses this problem by associating with each reference picture a sequence number, incremented "each time a reference picture is encoded," so the decoder "is capable of determining whether a reference picture has been lost and . . . take appropriate action." '005 Patent 4:2-19, 4:23-35, 5:4-16. Claim 1 requires "a sequence indicator having an independent numbering scheme" whose increments are "independent of . . . non-reference pictures encoded between successive reference pictures." *Id.* cl.1. This ensures the temporal order of reference pictures is encoded, allowing the system to distinguish lost reference pictures and avoid needless concealment. *Id.* 4:23-37; D.I. 1 ¶¶ 113-16.

Paramount's reliance on *TLI Communications LLC v. AV Automotive* is inapposite. *TLI* concerned generic metadata storage and was "not directed to a specific improvement to computer functionality." *Id.* 823 F.3d at 612-15. The '005 Patent, by contrast, recites a particular encoding structure that alters how a computer encoder signals temporal references to improve error detection and concealment—enhancing "the functioning of the computer itself." *Enfish*, 822 F.3d at 1335.

### 2.    Step Two - The '005 Patent Includes Limiting Inventive Concepts

The '005 Patent claims require "a sequence indicator having an independent numbering scheme" to "indicat[e] an encoding order of those pictures used to form reference pictures," with values that differ by a defined amount "independent of . . . non-reference pictures encoded between successive reference pictures." '005 Patent cl.1. Incrementing the indicator "each time a reference picture is encoded" allows the decoder "to determine whether a reference picture has been lost and . . . take appropriate action." *Id.* 4:13-19, 4:23-35. Prior systems lacked this mechanism, leading to freezes or wasteful concealment. *Id.* 2:29-64, 3:35-62; D.I. 1 ¶¶ 111-12.

The inventive concept is not "numbering" in the abstract but an encoder-imposed, independent sequence indicator in bitstreams limited to reference pictures and decoupled from

14

intervening non-reference frames, enabling targeted loss detection and concealment that improve video quality—an arrangement that "operate[s] in an unconventional manner to achieve an improvement in computer functionality." *Amdocs (Isr.) Ltd.*, 841 F.3d at 1300-01; *see BASCOM*, 827 F.3d at 1350. Nor does *Erie Indemnity Co.* apply; those claims used routine indexing with generic components. *See* 850 F.3d at 1329. The '005 Patent alters the way in which an encoder creates a bitstream for prediction and error resiliency rather than providing data lookup. '005 Patent 4:3-19, cl.1. Paramount's "teachers checking for lost children" analogy fails because the method is implemented in hardware and software to encode reference-picture order independently of non-reference content to improve error resiliency—an improvement "rooted in computer technology." *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257-59 (Fed. Cir. 2014).[6]

### D.    The '450 Patent is Directed to Patent-Eligible Subject Matter

Prior to the '450 Patent, discrete cosine transform ("DCT") operations and quantization for use in digital video coding involved operations that require numerous multiplications by irrational constants—operations that are computationally expensive, and in fact cannot be implemented exactly in digital systems (as infinite number precision would be required) and are ill-suited to low-power or real-time hardware. '450 Patent at 1:20-45. These prior approaches had significant drawbacks, including deterioration in image quality, the sacrificing of too much coding accuracy, or the introduction of cumbersome correction stages that negated any computational benefit. *Id.* at 3:27-4:15. By re-structuring the DCT operation and including a compensating quantization operation, the '450 Patent increases computation speed, decreasing complexity, improving power consumption, and providing encoding efficiency. '450 Patent at Abstract, 1:7-18; 5:10-16.

---

[6] The teacher analogy fails: A teacher does not classify children to serve as a reference to predict other children, including where some predicted children are used to predict others. Some children would have to be irrelevant for future predictions, with their loss permitted and acceptable.

1.     **Step One - The '450 Patent is Directed to Non-Abstract Subject Matter**

a.     **Paramount Oversimplifies the Claims of the '450 Patent**

Paramount oversimplifies the claims of the '450 Patent by contending that they are directed to "the abstract idea of using mathematical concepts in video compression." D.I. 9 at 18. Paramount's oversimplification impermissibly describes the claims "at too high a level of abstraction" that is "untethered from the language of the claims." *Enfish*, 822 F.3d at 1337.

Paramount's oversimplification improperly ignores claim limitations, such as, those requiring a method that factors the exact DCT matrix $\mathbf{T}$ into $\mathbf{T} = \mathbf{D} \cdot \mathbf{S}$, where $\mathbf{D}$ is a diagonal matrix and $\mathbf{S}$ is a "simplified transform matrix." '450 Patent at 5:20-22, 6:12-19, claim 31 ("applying a simplified transform matrix …, [which is] obtained by simplifying a predetermined transform matrix to require less operations when applied to digital data, and [] matrix elements constituting irrational numbers are approximated by rational numbers."). The '450 Patent's methods then approximate each irrational element of $\mathbf{S}$ by a rational value whose denominator is a power of two. Because divisions by powers of two reduce to bit-shift operations in binary representations, the resulting transform can use only additions and shifts, without using less efficient multiplications. *Id.* at 6:20-35, claim 31 (("simplifying a predetermined transform matrix to require ***less operations*** when applied to digital data") (emphasis added).

The operations removed from the transform matrix during simplification, as well as the errors introduced by approximating irrational numbers, are compensated for by extending and adjusting the following quantization step. Replacing irrational coefficients with rational approximations would ordinarily introduce systematic gain errors. The '450 Patent resolves this by extending and adapting the quantizer step size so that the quantization stage absorbs those gain differences. *Id.* at 5:22-26, claim 31 ("the extended quantization operation being obtained from a predetermined quantization operation by including operations removed by simplifying the

predetermined transform matrix, said extended quantization operation being adjusted to compensate for said approximation of elements of said simplified transform matrix"). In other words, any error introduced in the forward transform is compensated before entropy coding, thereby preserving overall reconstruction fidelity. *Id.* at 6:36-44, 5:54-6:9, claim 31 ("said extended quantization operation being ***adjusted to compensate for said approximation of elements*** of said simplified transform matrix") (emphasis added). These limitations must be considered. *Cosmokey*, 15 F.4th at 1097; *Redwood Techs.*, 2024 WL 4591852, at *5.

> **b.    The '450 Patent Claims Are Directed to Improvements to Computer Processing for Discrete Cosine Transform ("DCT").**

The '450 Patent's inventions are directed to specific methods for performing the transform-and-quantization sequence that reduces computational complexity without sacrificing inverse-transform fidelity. '450 Patent, 5:54-63, *see also* 5:64-6:9. Independent claim 31 recites, and the specification describes, a pipeline redesign that moves computations into a more efficient sequence: removing certain operations to "simplify[] a predetermined transform matrix," approximating remaining irrational coefficients with rational values suited to efficient integer operations, and then moving the removed factored operations into an extended quantization that is "adjusted to compensate" for those approximations. *Id.* at 5:17-33. That is, the invention describes and claims a transform and quantizer that are designed to work with simplified, integer-friendly transforms while maintaining quality and invertibility. *Id.* at 5:54-63.

The claims of the '450 Patent are therefore directed to non-abstract, patent-eligible subject matter. *See Cal. Inst. of Tech. v. Broadcom Ltd.*, 25 F.4th 976 (Fed. Cir. 2022) (holding an encoding patent claim to be patent eligible because it "claims more than a mathematical formula because it is directed to an efficient, improved method of encoding data that relies in part on irregular repetition"). Independent claim 31 addresses a specific computer-centric problem (i.e.,

too many nontrivial multiplications and high-precision arithmetic in transform coding) which is solved by reconfiguring the data path to reduce operation count to enable faster, lower-resource implementations, with quality safeguards via the quantizer compensation that preserves forward/inverse properties. '450 Patent at 5:54-63. Claim 31 requires the extended quantization to "include" the removed operations and to be "adjusted to compensate" for the transform approximations to achieve better performance on the computer itself. *Id.*

Paramount's cited authorities for *Alice* step one do not control. Decisions finding "encoding and decoding image data" abstract involved claims recited at a level of generality without a specific improvement to how a computer executes such operations on digital data. Similarly, cases holding that an "application" of a "mathematical concept" is abstract involved claims that did not architect a computer procedure to reduce computational cost while maintaining critical inverse properties through a compensating stage. *RecogniCorp, LLC*, 855 F.3d at 1328. Unlike *RecogniCorp*, in which the claim at issue was deemed patent ineligible because it recited only "performing at least one multiplication operation on facial code" (*id.* at 1324-25), claim 31 restructures an encoding operation by simplifying a transform matrix to reduce the number of operations, approximating irrational numbers in the transform matrix with rational numbers, and then compensating for such by including removed operations in the quantization step. This is a specific technological improvement in encoding and decoding implemented on a computer.

### 2.    Step Two – The '450 Patent Includes Limiting Inventive Concepts

Even if the Court were to proceed to *Alice* step two, claim 31 recites an inventive concept in its ordered combination. The inventive arrangement is not simply to use mathematical concepts.

As described above, first, the claimed method "simplif[ies] a predetermined transform matrix to require less operations when applied to digital data," not in the abstract, but with an explicit constraint on the simplification, by "approximat[ing]" irrational elements "by rational

numbers." The specification teaches integer-friendly transforms, reducing operation counts by using additions, subtractions, and shifts, to enable a practical implementation to reduce the computations required in encoding and decoding on a digital computer. '450 Patent, 6:13-34.

Second, the claimed method then requires "performing an extended quantization operation." Unlike a conventional quantizer, the extended quantization is "obtained … by including operations removed by simplifying the predetermined transform matrix," such that the extended quantization is "adjusted to compensate for [the] approximation" made in the transform matrix. That compensation requirement permits "guarantee[ing] a high quality of the digital data after decompression," is a substantive limitation that prior art approaches lacked. '450 Patent, 5:15-16. The '450 Patent explains that earlier factorizations or approximations created inverse-transform inaccuracies and quality loss (*e.g.*, *id.* at 3:50-55), while the claimed invention cures that by expressly relocating and adjusting the removed operations inside the quantization stage so the forward/inverse pair maintains desired properties. *Id.* at 6:2-9.

Third, the claim ties these steps together in an encoder that yields real, computer-level benefits that includes fewer complex multiplications, reduced word width, shift/add arithmetic, and improved speed, while maintaining reconstruction quality in encoding and decoding from the compensating extended quantization. Those benefits flow from the claimed method.

Paramount's assertion that the claim recites a "basic mathematical concept" ignores the claimed practical implementation. The transform is simplified by removing operations, while the extended quantization must both include the removed operations and be adjusted to compensate for the transform approximations. Neither is a routine or conventional use of a DCT transform or quantizer; it is a redesigned transform and quantizer designed to absorb and correct for a transformed data path. Paramount does not consider the "adjusted to compensate" requirement.

19

Nor do Paramount's cited cases negate eligibility. Decisions finding "math on a computer" ineligible involved claims that simply computed and reported results, or that improved only the math itself without changing how the computer's components cooperated to process data. Claim 31 requires an unconventional data path and a compensating quantization so a simplified transform can be executed efficiently without the quality penalties from earlier approximations—it recites a specific technological solution to improve computer-implemented encoding and decoding.

### E.    At A Minimum, Step Two Raises Plausible Fact Disputes

A motion to dismiss on § 101 grounds should only be granted when there are no plausible factual disputes after drawing all reasonable inferences from the intrinsic record in favor of the non-movant. *Coop. Entm't.*, 50 F.4th at 130. If nothing else, Paramount's step-two arguments raise factual issues that cannot be resolved on a motion to dismiss. Whether the claimed combination was "well-understood, routine, [and] conventional" is a factual question requiring clear and convincing proof. *Berkheimer*, 881 F.3d at 1368. The complaint and specification allege that the ordered combination was not routine and yielded concrete technical improvements. '204 Patent 3:25-31, 4:35-45, 4:45-52; D.I. 1 ¶¶ 189-190; '321 Patent 3:37-4:4, 4:16-38, 4:48-58, 4:64-5:5, 22:63-65; D.I. 1 ¶¶ 92-96; '005 Patent 4:3-37, cl.1; D.I. 1 ¶¶ 113-16; '450 Patent 5:10-63, 6:12-44, cl. 31; D.I. 1 ¶¶ 122-127. Paramount has not met its burden—the Complaint raises fact disputes as to whether each patent introduces an inventive concept.

## IV.    CONCLUSION

Paramount's Motion to Dismiss should be denied. In violation of controlling law, Paramount over genericizes the claimed inventions and fails to meet its burden to prove any patent claim at-issue is ineligible under Section 101—particularly at the motion to dismiss stage.

Dated: November 13, 2025

Of Counsel

Warren Lipschitz
wlipschitz@mckoolsmith.com
Erik Fountain
efountain@mckoolsmith.com
Alexander J. Chern
achern@mckoolsmith.com
Kyra Cooper
kcooper@mckoolsmith.com
**MCKOOL SMITH, P.C.**
300 Crescent Court Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Telecopier: (214) 978-4044

R. Mitch Verboncoeur
mverboncoeur@mckoolsmith.com
Joshua Budwin
jbudwin@mckoolsmith.com
**MCKOOL SMITH, P.C.**
303 Colorado Street, Suite 2100
Austin, TX 78701
Telephone: (512) 692-8752

Respectfully submitted,

**FARNAN LLP**

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Phone: (302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com